GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
YOLANDA OCHOA (Cal. Bar No. 267993)
Email: ochoay@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

19 - mc - 5

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| RALPH T. IANNELLI and ESSEX CAPITAL CORPORATION, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

JAN 14 2019

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because defendant Ralph T. Iannelli ("Iannelli") resides in this district and defendant Essex Capital Corporation ("Essex") has its principal place of business in this district.

## SUMMARY

4. This action arises from an $80 million offering fraud perpetrated by securities fraud recidivist Iannelli and his equipment leasing company, Essex. Between 2014 and 2017, Iannelli attracted investment through the sale of promissory notes that paid a high rate of return – typically 8.5% per annum. Those investor returns were supposedly based on the strength of Essex's equipment leasing model, in which Essex's lease portfolio would generate sufficient income to fully offset its borrowing costs and obligations to noteholders, leaving Essex with a profit of its own. Between 2014 and 2017, Iannelli raised over $80 million from approximately 70 promissory note investors. Unbeknownst to the investors, however, the representations Iannelli made about their investment were materially false and misleading.

5. Year after year, operational revenues from Essex's leasing business have comprised only a small fraction of its incoming cash flows. The majority of Essex's funds have instead come from promissory note investors and bank loans. For instance, between 2014 and 2016, approximately $107 million of Essex's revenue came from investors and banks and only approximately $34.4 million came from

equipment leasing income during that same time period. And according to its own financial statements, Essex sustained a staggering $32 million in operating losses from 2014 to 2016 (the company has not completed its 2017 financials). This was due, in part, to Essex using the bulk of its revenues to pay back investors and banks instead of using it to purchase income generating equipment. Between 2014 and 2016, Essex used approximately $65 million of its revenues to pay back investors and banks and only approximately $39.4 million of its revenues to purchase equipment. Nevertheless, Essex has taken several steps to create the illusion that its business model works, allowing it to be exceedingly successful at raising money from investors and bank lenders despite being unprofitable since at least 2014.

6.     To maintain Essex's veneer of financial success, stay current on its obligations to its promissory note investors, and continue to raise new investor funds, defendants: (i) resorted to a pattern and practice of making Ponzi-like payments (*i.e.*, paying interest and principal owed to investors using other investors' funds) for a total amount of at least $15 million since 2014; (ii) materially misrepresented Essex's financial condition to a registered investment adviser whose clients eventually invested more than $8 million in Essex's promissory notes; (iii) lied to another registered investment adviser about the basic structure of its clients' eventual $23 million investment in Essex; and (iv) extended over $60 million in personal guarantees on investor notes that Iannelli, given his actual net assets, had no hope of being able to honor. Rather than promptly alerting investors to Essex's steep financial losses, Iannelli protected only his own financial interests, by siphoning millions of dollars out the company in the form of discretionary bonuses and no-interest/no-maturity date personal loans to himself from 2014 to the present.

7.     By engaging in this conduct, Iannelli and Essex have violated the antifraud provisions of Sections 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

8.     The SEC seeks a preliminary injunction against Iannelli and Essex prohibiting them from committing future violations.  The SEC further seeks against Iannelli and Essex an order requiring an accounting, imposing an asset freeze, and appointing a permanent receiver over Essex and all its assets.

## THE DEFENDANTS

9.     **Ralph T. Iannelli** resides in Santa Barbara, California and is the president and founder of Essex Capital Corporation.  In or about August 1974, the SEC filed a complaint against Iannelli, alleging that he violated the antifraud provisions of federal securities laws, namely Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, by purchasing over 100,000 shares of stock for clients without their consent in order to manipulate the price of the stock.  *SEC v. Iannelli et al.*, Case No. 74-cv-3417, 1975 WL 348 (S.D.N.Y. 1975).  Iannelli consented to the entry of a permanent injunction and later to an order permanently barring him from association with any broker, dealer, investment company or investment adviser.  *Id.*  On March 31, 1976, Iannelli was convicted of criminal contempt for violating the 1974 permanent injunction to which he consented.

10.     **Essex Capital Corporation** is a California company founded by Iannelli in 1993 with its principal place of business in Santa Barbara, California.  Essex operates as a lease financing business and is wholly owned by Iannelli.  Essex is not registered with the Commission in any capacity.

## RELEVANT ENTITIES

11.     **Investment Advisor A** registered as an investment adviser firm in 2003 and is located in Santa Barbara, California.  As of December 31, 2017, Investment Advisor A had approximately 30 clients who are high net worth individuals and over $270,000,000 in assets under management.  Investment Advisor A has no disciplinary history with the SEC.

12.     **Investment Advisor B** registered as an investment adviser firm in 2014 and is located in New York City, New York.  As of December 31, 2017, Investment

Advisor B had approximately 16 clients who are high net worth individuals and over $720,000,000 in assets under management. Investment Advisor B has no disciplinary history with the SEC.

## THE FRAUDULENT SCHEME

**A.  Essex's Purported Business Model**

13.   Iannelli has been Essex's sole shareholder and president and chief executive officer since approximately 1996. Iannelli claims that he has over 35-years of experience in the equipment leasing industry and has focused Essex's business on providing late stage startup companies with access to capital equipment.

14.   The equipment that Essex claims to lease to startup companies is specialized business essential equipment, including durable medical equipment such as wheelchairs and hospital beds.

15.   Iannelli has raised capital for Essex by soliciting his friends and members of his community, who are high net worth individuals in and around Santa Barbara, California, to invest in Essex. Some of these friends and community members referred other investors to Essex. Iannelli typically offered investors promissory notes as the investment vehicle, where the interest rate and other terms of their investments were set forth. The promissory notes that Iannelli offered investors between 2014 and 2017 typically promised investors interest of approximately 8.5 percent interest, but occasionally as high as 10 percent interest, and in or around 2011, occasionally as low as 3 percent interest. Essex's promissory notes were securities in the form of investment contracts involving the note holders' investment of money, in a common enterprise, with the expectation that returns on the notes would be derived from the efforts of Iannelli and Essex. Iannelli also raised capital for Essex by borrowing money from a local bank in Santa Barbara and at least one other financial institution and has, on at least two occasions, raised capital through soliciting registered investment advisers looking for higher yield investments for their clients.

16.     In one of its marketing materials, Essex claimed that 100 percent of investor funds would be used towards the purchase of equipment and investors would be paid back over 36 months, including their principal plus 8 percent interest.  Essex claimed it would do this by structuring the equipment lease payments so that its customers pay back the cost of the equipment over the 36 months at a fixed interest rate that can generate a total return of up to 11 percent.

17.     Essex has offered some of its investors what it referred to as "residual" payments.  According to Essex, these are the lease payments that it receives after the original lease term has expired or the payments it receives as a result of selling the equipment, which it says it typically sells for 10 to 20 percent of the original acquisition cost.

18.     Although the promissory notes generally specify a maturity date when investors can redeem their investments, Iannelli has amended several notes to add language that requires investors to provide a 90 day-notice of their intent to redeem or else their investments would automatically be "rolled over" and they would continue to receive their monthly payment amounts.

**B.     The Misappropriation of Investor Funds**

19.     By 2014, Essex was raising substantially more funds from its promissory note investors and its limited partnership investors than it was using to purchase equipment.  In 2014, Essex raised over $20 million from its promissory note investors and limited partnership investors, and borrowed an additional $6 million from banks, yet it only spent approximately $2.3 million – less than 9% – of its incoming funds to purchase equipment.  That same year, Essex spent more than $25 million of its incoming funds paying back investors and banks, and because of addition operating expenses ended up with a net operating loss of over $2 million.

20.     This trend continued in 2015 and 2016.  In 2015, Essex raised over $30 million from its promissory note investors and limited partnership investors, and borrowed an additional $13 million from banks, yet it only spent approximately $14.3

million – roughly 30% of its revenue - to purchase equipment. That same year, Essex spent more than more than $26 million of its incoming funds paying back investors and banks, and because of additional operating expenses ended up with a net operating loss of over $7 million.

21. In 2016, Essex again raised over $30 million from its promissory note investors and limited partnership investors, and borrowed an additional $2.8 million from banks, yet it only spent approximately $22.7 million to purchase equipment. That same year, Essex spent more than $13 million of its incoming funds paying back investors and banks, and because of additional operating expenses ended up with a net operating loss of over $22.8 million.

22. Between 2014 and early 2017, based on bank statement analysis, Essex's main source of cash flow was the money that it received from investor-funded promissory notes and investor-funded LLCs, not the money that it received from leasing equipment.

23. For example, in 2014, only 18 percent of Essex's cash flow (approximately $6,517,936) came from leasing income, while 65 percent of its cash flow for that same year (approximately $24,026,838) came from bank loans and investor-funded promissory notes and partnerships.

24. In 2015, only 16 percent of Essex's cash flow (approximately $9,243,319) came from leasing income, while 79 percent of its cash flow for that same year (approximately $44,899,377) came from bank loans and investor-funded promissory notes.

25. In 2016, only 25 percent of Essex's cash flow (approximately $17,615,342) came from leasing income, while 63 percent of its cash flow for that same year (approximately $45,165,276) came from bank loans and investor-funded promissory notes and partnerships.

26. With leasing revenue making up such a small percentage of Essex's cash flow year-after-year, Essex could not cover the principal and interest payments that it

owed to its banks and investors using just the lease payments. Instead, Essex engaged in a pattern of Ponzi-like payments.

27.     According to Essex's financial records, including its QuickBooks records, between 2014 through 2017, Essex made approximately 89 different payments to existing investors using funds that it had received from its new investors in an aggregate amount of about $15.6 million:

| Year | # of Ponzi-Like Payments | Total Amount of Ponzi-Like Payments |
|---|---|---|
| 2014 | 21 payments | $5.8 million |
| 2015 | 44 payments | $6.0 million |
| 2016 | 11 payments | $2.4 million |
| 2017 | 13 payments | $1.4 million |
| **TOTAL** | **89 payments** | **$15.6 million** |

28.     That Iannelli and Essex were engaging in a pattern and practice of Ponzi-like payments in order to stay current on Essex's obligations to promissory note investors – which was never disclosed by defendants to its investors – would have been important to a reasonable investor when making the decision to invest in Essex's promissory note instruments.

**C.     Essex's False Financial Statements**

29.     In or about June 2013, one of the banks that loaned money to Essex requested Iannelli to provide the bank with Essex's financial statements. Iannelli retained an outside accounting firm to prepare Essex's financial statements.

30.     On or about January 2, 2014, Iannelli provided the outside accountant with several documents that he knew the outside account would rely on in preparing Essex's financial statements, including a Form S-1 Registration Statement for filing

with the SEC that erroneously indicated that Essex owned approximately 1.4 million shares of a startup company that Essex had leased equipment to since 2013 ("Startup Company").

31.  Iannelli knew, or was reckless or negligent in not knowing, that the Form S-1 he provided to Essex's outside accountant vastly overstated the amount of shares Essex owned in Startup Company.

32.  On at least three separate occasions, Iannelli received information showing that Essex's shares in Startup Company were a fraction of what he had reported to the outside accountant.

33.  On or about January 22, 2014, three weeks after he had sent the Form S-1 containing erroneous information regarding Essex's ownership interest in Startup Company, Iannelli received an email from Startup Company containing its capitalization table, showing that Essex owned only 111,673 shares of Startup Company.

34.  On or about February 12, 2014, at Iannelli's request, Startup Company emailed Iannelli a second and updated capitalization table, showing that Essex owned only 145,501 shares of Startup Company and saying that a final share calculation would be sent to Iannelli within a few weeks.

35.  On or about March 19, 2014, Iannelli emailed a statement that he had received from Startup Company's transfer agent to a brokerage firm that Essex was using at the time. The statement made it clear that Essex only owned 113,329 shares of Startup Company.

36.  Iannelli did not furnish any of this information – the capitalization tables or the transfer agent email – to the outside accountant he retained to compile Essex's financial statements, and instead allowed the outside accountant to continue to rely on the erroneous Form S-1 to determine the value of Essex's total assets when preparing its 2014 and 2015 compiled financial statements.

37.  On or about February 24, 2015, the outside accountant emailed Iannelli a

1   table to review, itemizing the 2014 valuation of Essex's holdings in Startup

2   Company. The table Iannelli received from the outside accountant listed 1,394,737

3   shares of Startup Company as being "held directly" by Essex and valued them at

4   approximately $26,950,157, and listed 95,737 shares of Startup Company held in

5   Essex's brokerage accounts and valued them at approximately $1,859,596.

6        38.    Iannelli knew, or was reckless or negligent in not knowing, that neither

7   he nor Essex held any of Startup Company's shares "directly" and that Essex's only

8   shares in Startup Company at that point were those shares in Essex's brokerage

9   account.

10       39.    Iannelli did not correct the inaccuracy in the table that he received from

11  the outside accountant and instead wrote back, "Thanks and then we have [Startup

12  Company's] warrants." Nor did Iannelli correct this false information when it

13  appeared in Essex's 2014 and 2015 compiled financial statements.

14       40.    Iannelli never discussed this inaccuracy in Essex's 2014 and 2015

15  compiled financial statements ("the false financial statements") with Essex's outside

16  accountant until 2017, well after April 2016 when Iannelli "had a firm belief" that the

17  information he had provided to the outside accountant regarding the number of shares

18  Essex owned in Startup Company was "wrong."

19  **D.    Misrepresentations to Investment Advisor A**

20       41.    The Manager of Investment Advisor A was primarily responsible for

21  advising the clients of Investment Advisor A on their investment decisions. Since

22  approximately 2002, the Manager of Investment Advisor A has been recommending

23  Essex as an investment to clients who wanted higher yield investments, because

24  Essex offered a return of between eight and eleven percent to its investors.

25       42.    Between February 2015 and March 2017, more than 20 clients of

26  Investment Advisor A invested approximately $8.1 million in Essex promissory

27  notes. A material factor in the Manager of Investment Advisor A's decision to

28  recommend Essex as an investment to clients were the false financial statements

1  prepared by Essex's outside accountant for Essex for 2014 and 2015.

2      43.   As set forth above, the false financial statements that the Manager of

3  Investment Advisor A relied on in recommending Essex to clients was based on the

4  erroneous information that Essex owned approximately 1,394,737 shares of Startup

5  Company that were allegedly worth approximately $26,950,157.

6      44.   On or about January 22, 2015, Iannelli directed Essex's outside

7  accountant to provide the Manager of Investment Advisor A with the false financial

8  statements, as of December 31, 2013.

9      45.   Specifically, the December 31, 2013 false financial statements that the

10  Manager of Investment Advisor A received from Essex's outside accountant falsely

11  stated, among other things, that Essex's private equity holdings had an estimated fair

12  value of $56,669,907, including shares in Startup Company worth approximately

13  $31,569,000, and a subsequent event note that falsely stated that Essex had a

14  $37,174,000 ownership interest in Startup Company.  These false statements in the

15  December 31, 2013 financial statements were material to the Manager of Investment

16  Advisor A's decision to recommend, and continue to recommend, Essex as an

17  investment to clients.

18      46.   The December 31, 2013 false financial statements also incorrectly stated,

19  among other things, that Essex's assets totaled approximately $97,893,703 and that

20  its liabilities totaled approximately $82,294,959.  This was also material to the

21  Manager of Investment Advisor A's decision to recommend, and continue to

22  recommend, Essex as an investment to clients.

23      47.   As the Manager of Investment Advisor A continued to recommend

24  Essex as an investment to clients, Iannelli continued to provide, and have Essex's

25  outside accountant provide, the Manager of Investment Advisor A with the false

26  financial statements for Essex.

27      48.   On or about March 9, 2015, Iannelli directed Essex's outside accountant

28  to provide the Manager of Investment Advisor A with the false compiled financial

COMPLAINT                       11

statements for Essex, as of September 30, 2014.

49.    The September 30, 2014 false financial statements provided to the Manager of Investment Advisor A incorrectly stated, among other things, that Essex's assets totaled approximately $97,365,555 and that its liabilities totaled approximately $83,666,499. This was material to the Manager of Investment Advisor A's decision to recommend, and continue to recommend, Essex as an investment to clients.

50.    Unbeknownst to the Manager of Investment Advisor A, as of December 31, 2014, Essex's assets only totaled approximately $67,466,124 and its liabilities totaled approximately $72,785,820.

51.    Had the Manager of Investment Advisor A known this, it would have caused the Manager of Investment Advisor A to scrutinize Essex more closely before recommending it as an investment to clients and would have impacted the Manager of Investment Advisor A's decision to recommend, and continue recommending, Essex as an investment to clients.

52.    In 2016, Iannelli provided, or directed Essex's outside accountant to provide, the Manager of Investment Advisor A with the false financial statements for Essex, as of September 30, 2015.

53.    The September 30, 2015 false financial statements that the Manager of Investment Advisor A received incorrectly stated, among other things, that Essex's assets totaled approximately $123,742,107 and its liabilities totaled approximately $107,472,624. This was material to the Manager of Investment Advisor A's decision to recommend, and continue to recommend, Essex as an investment to clients.

54.    Unbeknownst to the Manager of Investment Advisor A, as of December 31, 2015, Essex's assets only totaled approximately $82,652,514 and its liabilities totaled approximately $95,014,423.

55.    Had the Manager of Investment Advisor A known this, it would have caused the Manager of Investment Advisor A to scrutinize Essex more closely before

1   recommending it as an investment to clients and would have impacted the Manager
2   of Investment Advisor A's decision to recommend, and continue to recommend,
3   Essex as an investment to clients.

4       56.    Throughout this time period, Iannelli led the Manager of Investment
5   Advisor A to believe that the false financial statements he received for Essex were, in
6   fact, accurate.

7   **E.    Misrepresentations to Investment Advisor B**

8       57.    The General Manager of Investment Advisor B was primarily
9   responsible for advising clients of Investment Advisor B on investment decisions.
10  Between 2015 and 2016, approximately 15 clients of Investment Advisor B invested
11  in Essex and their combined investments totaled approximately $23 million.

12      58.    The clients of Investment Advisor B invested in Essex through
13  convertible promissory notes that were supposed to be converted into ownership
14  interests in two limited liability companies (LLC's).

15      59.    In or about October 2015, the General Manager of Investment Advisor B
16  began recommending Essex as an investment to clients who wanted a higher yield on
17  their investments.  Iannelli made several material false and misleading statements to
18  the General Manager of Investment Advisor B and others acting on behalf of
19  Investment Advisor B when describing how the investments would be structured and
20  how investor funds would be spent.

21      60.    Back in June 2015, Iannelli had met with the General Manager and
22  others at Investment Advisor B in New York and told them that Essex would match
23  "one-to-one" the investments that its clients made in Essex.  According to Iannelli,
24  the clients of Investment Advisor B would invest in Essex through convertible
25  promissory notes, which they would assign to one of the LLC's and, in exchange,
26  receive a 50 percent membership interest in that LLC.  At the same time, Iannelli
27  would assign to the LLC's any leases that Essex obtained using the funds the clients
28  invested, which would make the LLC's entitled to the lease payments.  When the

1   lease payments were received, Essex would receive approximately 20 percent of the

2   payments and the clients of Investment Advisor B would receive approximately 80

3   percent. The clients of Investment Advisor B would also receive all or a portion of

4   the warrants and securities issued to Essex by the lessees, and all or a portion of the

5   residual value of the leased equipment at the end of the lease term.

6      61.    After the clients of Investment Advisor B began investing in Essex,

7   Iannelli took steps to make it appear as though he and Essex were carrying out the

8   promises and representations they had made. On or about October 30, 2015, Iannelli

9   sent the Managing Member of Investment Advisor B an email stating, "The first 4

10   million was attributed to [four companies that leased equipment from Essex]" and

11   "the next two million will be for [two more companies that leased equipment from

12   Essex]."

13      62.    On or about December 21, 2015, Iannelli executed an "Assignment of

14   Equipment Leases" on behalf of Essex in which he purported to assign to one of the

15   LLC's "all right, title, and interest of [Essex] in the Equipment Lease Agreements

16   referenced on Schedule A."

17      63.    On or about April 26, 2016, after its clients had begun investing in

18   Essex, the Managing Member of Investment Advisor B sent Iannelli an email asking

19   Iannelli to confirm that Essex would still be investing "1:1 alongside us." Iannelli

20   wrote back saying, "As always we are 50/50 on each transaction."

21      64.    On or about January 14, 2017, when the General Manager of Investment

22   Advisor B asked Iannelli to send marketing materials for Essex to one of its clients,

23   Iannelli sent the General Manager of Investment Advisor B materials that stated,

24   among other things, Essex would invest "side-by-side" with its investors.

25      65.    All of these representations that Iannelli made to the General Manager

26   and others at Investment Advisor B were materially false and misleading. Iannelli

27   and Essex never matched any of the money that the clients of Investment Advisor B

28   invested in Essex. Iannelli knew, or was reckless or negligent in not knowing, that

1  Essex could not match those investments because Essex did not have sufficient funds
2  to do so.

3       66.    Iannelli never assigned the equipment leases to the two LLC's as he
4  promised. Iannelli knew, or was reckless or negligent in not knowing, that neither he
5  nor Essex could assign the equipment leases identified in his October 30, 2015 email
6  to the LLC's, because Iannelli himself had already pledged those leases as the
7  security for loans Essex had with banks. And for those leases that he had not already
8  pledged, instead of assigning them to the LLC's as represented, Iannelli used them as
9  collateral for still more bank loans.

10       67.    Defendants' misrepresentations about two key aspects of Investment
11  Advisor B's clients' investment – that Essex would match their investment dollar for
12  dollar as well as assign the equipment leases financed by their investment to an LLC
13  vehicle jointly-owned by those investors – were material because they concerned
14  facts that a reasonable investor would consider important when deciding to invest.
15  Indeed, had Investment Advisor B known that leases were not going to be assigned to
16  the LLC vehicles, it never would have invested its clients in Essex.

17  **F.    Misrepresentations to Investment Advisors A and B, and Other Investors**

18       68.    Another misrepresentation that Iannelli made to the Manager and
19  General Manager of Investment Advisors A and B, respectively, as well as to his
20  other investors, was that Iannelli would personally guarantee their investments.

21       69.    For example, between 2015 and 2017, Iannelli led the Manager of
22  Investment Advisor A to believe that he had only given this personal guarantee to a
23  few investors. Iannelli provided, or instructed Essex's outside accountant to provide,
24  the Manager of Investment Advisor A with Essex's September 30, 2015 compiled
25  financial statements, which falsely stated, among other things, that Iannelli had only
26  personally guaranteed recourse notes totaling $11,514,525, as of September 30, 2015.
27  Iannelli's representation that he would personally guarantee the investments and
28  Essex's compiled financial statements were material to the Manager of Investment

Advisor A's decision to recommend, and continue to recommend, Essex as an investment to clients.

70.     Unbeknownst to the Manager and General Manager of Investment Advisors A and B, respectively, Iannelli personally guaranteed more than $60 million in promissory notes and debt between 2014 and 2017.  This was nearly five times greater than the value of Iannelli's personal assets at the time.

71.     Iannelli has admitted, under oath, that he "knew" he could not back up the personal guarantee he gave to the clients of Investment Advisor A and other investors, even though his investors "felt better knowing that [he] was personally guaranteeing the note."

72.     Iannelli's failure to disclose that his personal guarantee was practically meaningless, given the extent to which he had guaranteed Essex's promissory note obligations, was material because it concerned facts that a reasonable investor would consider important when deciding to invest.  Indeed, had the Manager of Investment Advisor A and General Manager of Investment Advisor B known that Iannelli could not stand behind his personal guarantee, they would not have recommended, or continue to recommend, Essex as an investment to clients.

**G.     Iannelli Profited From the Fraud**

73.     Although equipment leasing – the purported core of Essex's business – had stopped being the primary source of its revenue between 2014 and 2017, Iannelli continued to siphon millions of dollars out of the company in the form of discretionary bonuses and interest-free personal loans to himself:

| Year | Description | Payment |
|------|-------------|---------|
| 2014 | Discretionary Bonus | $500,000 |
| 2014 | Loan from Essex to Iannelli | $2.1 million |
| 2015 | Discretionary Bonus | $500,000 |

| 2015 | Loan from Essex to Iannelli | $1.8 million |
|------|------------------------------|--------------|
| 2016 | Discretionary Bonus | $700,000 |
| 2016 | Loan from Essex to Iannelli | $2 million |
| **TOTAL** | | $7.6 million |

## H.    Iannelli Acted with Scienter and Negligently

74.    As set forth above, Iannelli knew, or was reckless or negligent in not knowing, that the representations he made to the Manager and General Manager of Investment Advisors A and B, as well as to other investors, regarding their investments in Essex were materially false and misleading.

75.    Iannelli knew, or was reckless or negligent in not knowing, that the Form S-1 he provided to Essex's outside accountant was false and misleading, because shortly after he provided it he received multiple emails containing capitalization tables, showing that Essex's shares in the startup company were substantially less than 1.4 million shares reflected in its Form S-1. Iannelli also received Essex's brokerage account statements and an email from Essex's transfer agent showing that the Form S-1 he provided to Essex's outside accountant was false and inaccurate, and admitted under oath that by April 2016 he had a "firm belief" that the information he had provided to the outside accountant regarding the number of shares Essex owned in the startup company was "wrong."

76.    Iannelli knew, or was reckless or negligent in not knowing, that the compiled financial statements he provided, or directed Essex's outside accountant to provide, the Manager of Investment Advisor A were false and misleading, because he had received an email from Essex's outside accountant showing that at least one of the compiled financial statements was based on the false Form S-1 Iannelli had provided, and that it falsely listed Essex's total assets as including approximately 1.4

1  million shares in Startup Company worth approximately $31,569,000. Iannelli did
2  not correct this inaccuracy in the compiled financial statements even though Essex's
3  outside accountant asked Iannelli to review the compiled financial statements and
4  Iannelli had information showing that it was false.

5      77.    Iannelli knew, or was reckless or negligent in not knowing, that Essex
6  could not match "one-to-one" the investments that Investment Advisor B's clients
7  made in Essex, because, as Iannelli later admitted under oath, Essex did not have
8  sufficient funds to match the $23 million invested by Investment Advisor B's clients.

9      78.    Iannelli knew, or was reckless or negligent in not knowing, that Essex
10 could not assign the LLC's the equipment leases identified in his October 30, 2015
11 email to the Managing Member of Investment Advisor B, because Iannelli had
12 already pledged many of those leases as security for loans he had previously taken
13 out with banks.

14     79.    Iannelli knew, or was reckless or negligent in not knowing, that he could
15 not fulfill his promise to personally guarantee the investments made by the clients of
16 Investment Advisors A and B, and the investments made by Essex's other investors,
17 because, in total, Iannelli had personally guaranteed more than $60 million in
18 promissory notes and debts between 2014 and 2017, an amount nearly five times
19 greater than the value of Iannelli's personal assets.

20 I.    **Essex Is on the Verge of Collapse and Investor Funds are at Risk of**
21       **Dissipation**

22     80.    As set forth above, Essex's ability to pay back its current investors
23 depends almost entirely on its ability to obtain loans from banks or raise additional
24 funds from investors, which have been threatened by Essex's true financial condition
25 beginning to come to light in or about March 2017. This has left Essex on the verge
26 of collapse.

27     81.    In or about May 2017, after learning of the SEC's investigation, Iannelli
28 provided Essex's outside accountant with the accurate information regarding the

COMPLAINT                    18

1    actual number of shares it owned in Startup Company, which ultimately led the

2    outside accountant to restate Essex's financial statements for 2014 and 2015.

3          82.    According to Essex's restated financial statements, in 2014, Essex

4    operated at a net loss of $2,142,469 in 2014 and at a net loss of $7,042,213 in 2015.

5    Essex's outside accountant also expressed "substantial doubt" about Essex's ability to

6    continue as a going concern. Essex's 2016 financial statements report a net loss of

7    $22.8 million.

8          83.    According to Essex financial records from January 1, 2014 through

9    March 30, 2018, Essex's debt obligation for 2017 in principal and interest owed to

10    investors and banks totaled $40,289,130, while its revenue from lease income in 2017

11    was just $17,969,759.

12          84.    According to those same financial records, Essex currently owes one of

13    its commercial lenders $8 million, its investor-funded partnership entities $20

14    million, and its investor-funded promissory notes $50 million. However, Essex only

15    has $5.9 million in unencumbered assets in its brokerage account.

16          85.    According to schedules produced by Essex during the SEC's

17    investigation, Essex currently owes its promissory note investors approximately $28

18    million, and that only represents the promissory notes that have matured, which Essex

19    would have to repay in the near term if those investors exercised their right of

20    redemption.

21          86.    In addition to being insolvent, Essex's remaining assets are at risk of

22    being spent in a manner that gives preferential treatment to certain investors and

23    leaves others empty-handed. On or about November 15, 2017, Iannelli admitted that

24    one of the ways he has been meeting Essex's obligations is by singlehandedly

25    liquidating some of Essex's marketable securities and by using Essex's margin

26    account collateralized by its marketable securities.

27          87.    Unlike the clients of Investment Advisors A and B, many of Essex's

28    other investors are Iannelli's friends and their referrals, and Iannelli has already

begun using Essex's remaining assets to offer preferential payouts to those friends and referrals to the detriment of Investment Advisors A and B's clients.

### FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against All Defendants)**

88.    The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

89.    Defendants Iannelli and Essex each defrauded investors by making false and misleading statements about Essex's and Iannelli's financial condition and by claiming that investor funds would be used to purchase equipment Essex was going to leasing to its customers when, in fact, they knew, or were reckless or negligent in not knowing, that Essex's and Iannelli's liabilities far exceeded their assets and they were misappropriating and misusing investor funds to make Ponzi-like payments to existing investors and for the personal benefit of Iannelli.

90.    By engaging in the conduct described above, defendants Iannelli and Essex, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

91.    By engaging in the conduct described above, defendants Iannelli and Essex violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against All Defendants)

92.     The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

93.     Defendants Iannelli and Essex each defrauded investors through false and misleading statements about Essex's and Iannelli's financial condition and by claiming that investor funds would be used to purchase equipment Essex was going to leasing to its customers when, in fact, they knew, or were reckless or negligent in not knowing, that Essex's and Iannelli's liabilities far exceeded their assets and they were misappropriating and misusing investor funds to make Ponzi-like payments to existing investors and for the personal benefit of Iannelli.

94.     By engaging in the conduct described above, defendants Iannelli and Essex, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

95.     By engaging in the conduct described above, defendants Iannelli and Essex violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

# **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that defendants Iannelli and Essex ("defendants") committed the alleged violations.

## **II.**

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), preliminarily enjoining defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **IV.**

Issue, in a form consistent with Fed. R. Civ. P. 65, an order freezing the assets of defendants; ordering an accounting by defendants; and appointing a permanent receiver over Essex.

## **V.**

Order defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VI.

Order defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: June 5, 2018

/s/ Douglas M. Miller

GARY Y. LEUNG
DOUGLAS M. MILLER
YOLANDA OCHOA
Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>vs.<br><br>RALPH T. IANNELLI and ESSEX CAPITAL CORPORATION,<br><br>    Defendants. | Case No. 2:18-cv-05008-FMO-AFM<br><br>[PROPOSED] ORDER REGARDING PRELIMINARY INJUNCTION AND APPOINTMENT OF A PERMANENT RECEIVER |

1    The Court, having considered the forty-five day report prepared and submitted

2    by the court appointed monitor, Geoff Winkler, on December 5, 2018, any response

3    thereto, and the consent of Plaintiff the Securities and Exchange Commission,

4    Defendant Essex Capital Corporation ("Essex"), and Defendant Ralph T. Iannelli to

5    the entry of this proposed order, hereby finds that:

6        A.    This Court has jurisdiction over the parties to, and the subject matter of,

7              this action; and

8        B.    Good cause exists to warrant the appointment of Geoff Winkler as a

9              Receiver over Defendant Essex and its subsidiaries and affiliates.

10                                          **I.**

11   IT IS HEREBY ORDERED that Defendants Essex and Iannelli (collectively,

12   "Defendants"), and their officers, agents, servants, employees, attorneys, subsidiaries

13   and affiliates, and those persons in active concert or participation with any of them,

14   who receive actual notice of this Order, by personal service or otherwise, and each of

15   them, shall remain preliminarily restrained and enjoined from, directly or indirectly,

16   in the offer or sale of any securities, by the use of any means or instruments of

17   transportation or communication in interstate commerce or by the use of the mails:

18       A.    employing any device, scheme or artifice to defraud;

19       B.    obtaining money or property by means of any untrue statement of a

20             material fact or any omission to state a material fact necessary in order to

21             make the statements made, in light of the circumstances under which

22             they were made, not misleading; or

23       C.    engaging in any transaction, practice, or course of business which

24             operates or would operate as a fraud or deceit upon the purchaser;

25             in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

26                                          **II.**

27   IT IS FURTHER ORDERED that Defendants Essex and Iannelli, and their

28   officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those

persons in active concert or participation with any of them, who receive actual notice of this Order, by personal service or otherwise, and each of them, shall remain preliminarily restrained and enjoined from, directly or indirectly, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

      A.    employing any device, scheme or artifice to defraud;

      B.    making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      C.    engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

          in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court, Defendants Essex and Iannelli, and their officers, agents, servants, employees, attorneys, subsidiaries and affiliate, and those persons in active concert with them, who receive actual notice of this Order, by personal service or otherwise, and each of them, shall remain preliminarily restrained and enjoined from:

      A. directly or indirectly, transferring, assigning, selling, hypothecating, changing, wasting, dissipating, converting, concealing, encumbering, or otherwise disposing of, in any manner, any funds, assets, securities, claims or other real or personal property, including any notes or deeds of trust or other interest in real property, wherever located, of any one of the Defendants or their subsidiaries or affiliates, owned by, controlled by, managed by or in the possession or custody of any of them; or

B. from transferring, encumbering dissipating, incurring charges or cash advances on any debit or credit card of the credit arrangement of Defendant Essex, or their subsidiaries and affiliates.

**IV.**

IT IS FURTHER ORDERED that Paragraphs III and 0 shall not apply to the following transactions:

A. any compensation or funds received by Defendant Iannelli after November 30, 2018, so long as it is in no way related to Essex Capital and its affiliates, or Defendant Iannelli's association or prior control of Essex Capital and its affiliates;

B. social security payments to Defendant Iannelli; and

C. subject to the Receiver's approval to lift the freeze on such deposits, any deposits, withdrawals, or payments from the following accounts at Montecito Bank & Trust ("MBT") and Merrill Lynch ("ML"):

    i. Ralph T. Iannelli and Melissa R. Iannelli, MBT Acct. No. xxxxx3331;

    ii. Ralph Iannelli Jr. Family Irrevocable Trust, MBT Acct. No. xxxxx8912;

    iii. Ralph Iannelli Family Irrevocable Trust, MBT Acct. No. xxxxx8920;

    iv. Iannelli Family Irrevocable Trust, MBT Acct. No. xxxxx8939;

    v. Melissa R. Iannelli, ML Acct. No. xxxxx4225; or

    vi. Melissa R. Iannelli, ML Acct. No. xxxxx8702.

**V.**

IT IS FURTHER ORDERED that, except as provided in Paragraph IV of this Order or otherwise ordered by this Court, an immediate freeze shall be placed on all monies and assets in all accounts at any bank, financial institution or brokerage firm,

1 | or third-payment payment processor, all certificates of deposit, and other funds or

2 | assets, held in the name of, for the benefit of, or over which account authority is held

3 | by Defendants Essex and Iannelli, including but not limited to the accounts listed

4 | below:

| BANK NAME | ACCOUNT NAME | ACCOUNT NO. |
|---|---|---|
| E Trade | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx9733 |
| E Trade | Ralph Thomas Iannelli | xxxxx4415 |
| First Republic Bank | White Bay Essex Leasing | xxxxx1137 |
| First Republic Bank | Cornerstone Essex Leasing Co. LLC | xxxxx1270 |
| First Republic Bank | Essex-Granger LLC | xxxxx1348 |
| First Republic Bank | 1486 East Valley Rd LLC | xxxxx2611 |
| First Republic Bank | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx3593 |
| First Republic Bank | Essex-Granger II LLC | xxxxx7009 |
| First Republic Bank | Cornerstone Essex Leasing Co. II LLC | xxxxx8565 |
| First Republic Bank | Essex Capital Corporation | xxxxx8847 |
| First Republic Bank | Ralph T. Iannelli | xxxxx9049 |
| First Republic Bank | SIU Capital LLC | xxxxx9339 |
| First Republic Securities Company, LLC | Essex Capital Corporation | xxxxx3863 |
| First Republic Securities Company, LLC | Ram Capital Corporation | xxxxx6689 |
| Interactive Brokers | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx8388 |
| Jefferies LLC | Essex Capital Corporation | xxxxx2718 |
| Jefferies LLC | Essex Capital Corporation | xxxxx4748 |
| Merrill Lynch | Essex Capital Corporation | xxxxx2764 |
| Merrill Lynch | BYSE LLC c/o Ralph Iannelli | xxxxx3521 |
| Merrill Lynch | SIU Capital LLC | xxxxx3593 |
| Merrill Lynch | KP Investment Partners | xxxxx3594 |
| Merrill Lynch | KF Leasing Partners LP | xxxxx3665 |
| Merrill Lynch | Ralph T. Iannelli | xxxxx4222 |
| Merrill Lynch | Ralph T. Iannelli & Melissa R. Iannelli | xxxxx4223 |
| Merrill Lynch | Ralph T. Iannelli | xxxxx4224 |

| BANK NAME | ACCOUNT NAME | ACCOUNT NO. |
|---|---|---|
| Merrill Lynch | Melissa R. Iannelli | xxxxx4225 |
| Merrill Lynch | Ralph T. Iannelli and Melissa R. Iannelli | xxxxx4228 |
| Merrill Lynch | Melissa R. Iannelli | xxxxx8702 |
| Montecito Bank & Trust | KF Investment Partners LP | xxxxx1816 |
| Montecito Bank & Trust | Essex Capital Corporation | xxxxx3839 |
| Montecito Bank & Trust | Western Animal Supply LLC | xxxxx3959 |
| Montecito Bank & Trust | Essex Ocean LLC | xxxxx6982 |
| Montecito Bank & Trust | Essex Ocean LLC | xxxxx6990 |
| Montecito Bank & Trust | Essex-Granger LLC | xxxxx7276 |
| Montecito Bank & Trust | Essex-Granger II LLC | xxxxx7283 |
| Montecito Bank & Trust | Essex Capital Corporation | xxxxx7311 |
| Montecito Bank & Trust | 915 Elm Avenue CVL LLC | xxxxx8411 |
| Montecito Bank & Trust | Ralph Iannelli Jr. Family Irrevocable Trust | xxxxx8912 |
| Montecito Bank & Trust | Ralph Iannelli Family Irrevocable Trust | xxxxx8920 |
| Montecito Bank & Trust | Iannelli Family Irrevocable Trust | xxxxx8939 |
| UBS | Essex Capital Corporation | xxxxx70JM |
| Montecito Bank & Trust | KF Leasing Partners LP | xxxxx8947 |

Any bank, financial institution or brokerage firm, or third-party payment processor holding such monies and assets described above shall hold and retain within their control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets except as otherwise ordered by this Court.

## VI.

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court, an immediate freeze shall be placed on the title of the following properties, which shall not be mortgaged, transferred, or otherwise hypothecated:

| LISTED OWNER | ADDRESS |
|---|---|
| Ralph T. Iannelli | 266 Penny Lane, Santa Barbara, CA 93108 |
| Ralph T. Iannelli | 257 Central Park West, Apt. 4C, New York, NY 10024 |
| Ralph T. Iannelli | 915 Elm Avenue, Carpinteria, CA 93013 |

## VII.

IT IS FURTHER ORDERED that, within ten days from the date of this Order, Defendants, any bank, financial institution or brokerage firm, and each of them, shall transfer to the Receiver assets, funds and other property held in foreign locations in the name of any Defendant, or for the benefit or under the direct or indirect control of any of them, or over which any of them exercises control or signatory authority.

## VIII.

IT IS FURTHER ORDERED that Defendants, within five days of the issuance of this Order, shall, to the extent it has no previously been provided, prepare and deliver to the SEC a detailed and complete schedule of all of their personal assets, including all real and personal property exceeding $10,000 in value, and all bank, securities, and other accounts identified by institution, branch address and account number. The accounting shall include a description of the sources of all such assets. Such accounting shall be delivered to the SEC to the attention of Gary Leung and Doug Miller, counsel for the SEC. After completion of the accounting, each of the Defendants shall produce to the SEC at a time agreeable to the SEC, all books, records and other documents supporting or underlying their accounting.

## IX.

IT IS FURTHER ORDERED that any person who receives actual notice of this Order by personal service or otherwise, and who holds, possesses or controls assets exceeding $5,000 for the account or benefit of any one of the Defendants, shall within 5 days of receiving actual notice of this Order provide counsel for the SEC with a written statement identifying all such assets, the value of such assets, or best approximation thereof, and any account numbers or account names in which the assets are held.

## X.

IT IS FURTHER ORDERED that, except as otherwise ordered by this Court, each of the Defendants Essex and Iannelli, and their officers, agents, servants,

1  employees, attorneys, subsidiaries and affiliates, and those persons in active concert

2  or participation with any of them, who receive actual notice of this Order, by personal

3  service or otherwise, and each of them, shall remain preliminarily restrained and

4  enjoined from, directly or indirectly: destroying, mutilating, concealing, transferring,

5  altering, or otherwise disposing of, in any manner, any documents, which includes all

6  books, records, computer programs, computer files, computer printouts, contracts,

7  emails, correspondence, memoranda, brochures, or any other documents of any kind

8  in their possession, custody or control, however created, produced, or stored

9  (manually, mechanically, electronically, or otherwise), pertaining in any manner to

10  Defendant Essex.

11                                              **XI.**

12      IT IS FURTHER ORDERED that Geoff Winkler is appointed as Receiver of

13  Defendant Essex and its subsidiaries and affiliates, with full powers of an equity

14  receiver, including, but not limited to, full power over all funds, assets, collateral,

15  premises (whether owned, leased, occupied, or otherwise controlled), choses in

16  action, books, records, papers and other property belonging to, being managed by or

17  in the possession of or control of Defendant Essex and its subsidiaries and affiliates,

18  and that such Receiver is immediately authorized, empowered and directed:

19      A.    to have access to and to collect and take custody, control, possession,

20            and charge of all funds, assets, collateral, premises (whether owned,

21            leased, pledged as collateral, occupied, or otherwise controlled), choses

22            in action, books, records, papers and other real or personal property,

23            wherever located, of or managed by Defendant Essex and its subsidiaries

24            and affiliates (collectively, the "Assets"), with full power to sue,

25            foreclose, marshal, collect, receive, and take into possession all such

26            Assets (including access to and taking custody, control, and possession

27            of all such Assets);

28      B.    to assume full control of Defendant Essex by removing, as the Receiver

deems necessary or advisable, any director, officer, attorney, independent contractor, employee, or agent of any of Defendant Essex and its subsidiaries and affiliates, including any named Defendant, from control of, management of, or participation in, the affairs of Defendant Essex;

C.     to have control of, and to be added as the sole authorized signatory for, all accounts of the entities in receivership, including all accounts at any bank, title company, escrow agent, financial institution or brokerage firm (including any futures commission merchant) which has possession, custody or control of any Assets, or which maintains accounts over which Defendant Essex, and its subsidiaries and affiliates, and/or any of its employees or agents have signatory authority;

D.     to conduct such investigation and discovery as may be necessary to locate and account for all of the assets of or managed by Defendant Essex and its subsidiaries and affiliates, and to engage and employ attorneys, accountants and other persons to assist in such investigation and discovery;

E.     to take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation, concealment, or disposition of any Assets;

F.     to choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

G.     to make an accounting, as soon as practicable, to this Court and the SEC of the assets and financial condition of Defendant Essex and to file the accounting with the Court and deliver copies thereof to all parties;

H.     to make such payments and disbursements from the Assets taken into

custody, control, and possession or thereafter received by him or her, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver;

I.  to investigate and, where appropriate, to institute, pursue, and prosecute all claims and causes of action of whatever kind and nature that may now or hereafter exist as a result of the activities of present or past employees or agents of Defendant Essex, and its subsidiaries and affiliates;

J.  to institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts, which (i) the Receiver deems necessary and advisable to preserve or recover any Assets, or (ii) the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order; and

K.  to have access to and monitor all mail, electronic mail, and video phone of the entities in receivership in order to review such mail, electronic mail, and video phone which he or she deems relates to their business and the discharging of his or her duties as Receiver. The Receiver shall be authorized to review any communications between Defendant Essex and its counsel in this action. Should a dispute arise over the Receiver's authority to review or disclose any of Defendants' communications with counsel, the Receiver or the parties may petition the Court after making good faith efforts to resolve the dispute.

## XII.

IT IS FURTHER ORDERED that Defendant Essex and its subsidiaries and affiliates, including all of the other entities in receivership, and their officers, agents, servants, employees and attorneys, and any other persons who are in custody, possession or control of any assets, collateral, books, records, papers or other property of or managed by any of the entities in receivership, shall forthwith give

9

1    access to and control of such property to the Receiver.

2                                  **XIII.**

3        IT IS FURTHER ORDERED that no officer, agent, servant, employee or

4    attorney of Defendant Essex shall take any action or purport to take any action, in the

5    name of or on behalf of Defendant Essex without the written consent of the Receiver

6    or order of this Court.

7                                  **XIV.**

8        IT IS FURTHER ORDERED that, except by leave of this Court, during the

9    pendency of this receivership, all clients, investors, trust beneficiaries, note holders,

10   creditors, claimants, lessors and all other persons or entities seeking relief of any

11   kind, in law or in equity, from Defendant Iannelli, Defendant Essex, or its

12   subsidiaries or affiliates, and all persons acting on behalf of any such investor, trust

13   beneficiary, note holder, creditor, claimant, lessor, consultant group or other person,

14   including sheriffs, marshals, servants, agents, employees and attorneys, are hereby

15   restrained and enjoined from, directly or indirectly, with respect to these persons and

16   entities:

17       A.    commencing, prosecuting, continuing or enforcing any suit or

18             proceeding (other than the present action by the SEC or any other action

19             by the government) against any of them;

20       B.    using self-help or executing or issuing or causing the execution or

21             issuance of any court attachment, subpoena, replevin, execution or other

22             process for the purpose of impounding or taking possession of or

23             interfering with or creating or enforcing a lien upon any property or

24             property interests owned by or in the possession of Defendant Iannelli or

25             Defendant Essex; and

26       C.    doing any act or thing whatsoever to interfere with taking control,

27             possession or management by the Receiver appointed hereunder of the

28             property and assets owned, controlled or managed by or in the

                                      10

possession of Defendant Iannelli or Defendant Essex, or in any way to interfere with or harass the Receiver or his or her attorneys, accountants, employees, or agents or to interfere in any manner with the discharge of the Receiver's duties and responsibilities hereunder.

## XV.

IT IS FURTHER ORDERED that Defendant Essex, and its subsidiaries, affiliates, officers, agents, servants, employees and attorneys, shall cooperate with and assist the Receiver and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver or his or her attorneys, accountants, employees or agents, in the conduct of the Receiver's duties or to interfere in any manner, directly or indirectly, with the custody, possession, management, or control by the Receiver of the funds, assets, collateral, premises, and choses in action described above.

## XVI.

IT IS FURTHER ORDERED that Defendant Essex, and its subsidiaries and affiliates, shall pay the costs, fees and expenses of the Receiver incurred in connection with the performance of his or her duties described in this Order, including the costs and expenses of those persons who may be engaged or employed by the Receiver to assist him or her in carrying out his or her duties and obligations. All applications for costs, fees, and expenses for services rendered in connection with the receivership other than routine and necessary business expenses in conducting the receivership, such as salaries, rent, and any and all other reasonable operating expenses, shall be made by application setting forth in reasonable detail the nature of the services and shall be heard by the Court.

## XVII.

IT IS FURTHER ORDERED that no bond shall be required in connection with the appointment of the Receiver. Except for an act of gross negligence, the Receiver shall not be liable for any loss or damage incurred by any of the defendants, their

officers, agents, servants, employees and attorneys or any other person, by reason of any act performed or omitted to be performed by the Receiver in connection with the discharge of his or her duties and responsibilities.

## XVIII.

IT IS FURTHER ORDERED that representatives of the SEC is authorized to have continuing access to inspect or copy any or all of the corporate books and records and other documents of Defendant Essex, and the other entities in receivership, and continuing access to inspect their funds, property, assets and collateral, wherever located.

## XIX.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this action for the purpose of implementing and carrying out the terms of all orders and decrees which may be entered herein and to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

The Receiver is reminded that he is "an officer of the court and not an arm of the SEC[,]" S.E.C. v. Schooler, 2015 WL 1510949, *3 (S.D. Cal. 2015) (internal quotation marks omitted), and has been "appointed on behalf and for the benefit of all the parties having an interest in the property, not for the plaintiff or defendant[s] alone." S.E.C. v. Private Equity Management Group, Inc., 2009 WL 2019747, *2 (C.D. Cal. 2009) (internal quotation marks omitted).

IT IS SO ORDERED.

Dated: December 21, 2018 _____ /s/ _____

**HON. FERNANDO M. OLGUIN**

Judge of the District Court